FISHER v MULLER

1. TAXATION—ASSESSMENTS—NOTICE—COLLECTION—STATUTES—CON-
STRUCTION.

The statement in the tax assessment statute that "failure to send
or receive such notice shall not in any way prejudice the right
to collect or enforce the payment of any tax" does not mean
that notice of assessment changes is not required, but that
should tax assessing authorities fail to give or attempt to give
reasonable notice of an assessment change, it will not prejudice
their right, in some later taxing period, to give or attempt to
give the proper notice and collect previously owed taxes (MCLA
211.44).

2. TAXATION—ASSESSMENTS—NOTICE—TAX LIENS—TAX SALES.

Failure to give landowners proper notice by mail of a tax assess-
ment increase where their residential mailing address was
known barred the subsequent tax lien and sale of the land for
delinquent taxes.

3. COSTS—INVALID TAX SALE—PUBLIC OFFICIALS.

Court costs of a trial and appeal should not be assessed against
individual defendant deed holders under an invalid tax sale
where public officials appear primarily responsible for the
plaintiffs' suit to set aside the deed.

Appeal from Alpena, Philip J. Glennie, J. Sub-
mitted Division 3 February 12, 1974, at Lansing.
(Docket No. 16684.) Decided May 1, 1974.

Complaint by Robert F. Fisher, Jr., and Eileen
Fisher against Frank Muller, Lucy Muller, the
State Treasurer, Allison Greene, and Ellwood
Coombs, Alpena County Treasurer, for a declara-
tion that a tax deed to certain land is void. Judg-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 51 Am Jur, Taxation § 728 *et seq.*
[3] 51 Am Jur, Taxation § 1045.

ment for plaintiffs. Defendants Muller appeal. Affirmed as amended.

*Gillard & Gillard,* for plaintiffs.

*Muller, Holmes & Muller,* for defendants Muller.

Before: J. H. GILLIS, P. J., and HOLBROOK and DENEWETH,* JJ.

HOLBROOK, J. Plaintiffs brought this suit in January 1971 to have declared void a tax deed on their property issued by the state to the defendants Muller. Trial was held in Alpena County Circuit Court, and on February 21, 1973, the trial judge determined that the deed should be voided and ordered the defendants to quitclaim all their interests in the property to the plaintiffs in compliance with his judgment of ownership. Only defendants Muller now appeal that decision as of right.

In 1932, plaintiff Robert Fisher purchased certain land from Thomas Goodburne. After he purchased the land, he built a cabin on it. Mr. Fisher testified that when he inquired about taxes on the property the following year, the county treasurer told him that the tax on his property would be so small that a separate tax bill for the 100-foot by 100-foot parcel that Fisher bought from Goodburne would not be issued until the valuation of the parcel increased. Mr. Fisher was told he would be notified if and when taxes were assessed. At no time was Mr. Fisher notified of a tax assessment against his property and consequently he has never paid taxes thereon. Mr. Fisher did admit he has never given the county treasurer his name

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and address and never specifically inquired as to the tax status of the property after 1933.

In 1949 Alberta Goodburne (she apparently was Thomas Goodburne's widow) died leaving the Goodburne real property to be divided among her heirs. Excepted from the description of the land passed on to her heirs via a probate court order was the following described property:

"Excepting the portions thereof described as follows: Lots 5 & 6, Block 2 of the plat of Kabekonah as set forth in deed volume 76, page 286, Alpena County records; also excepting therefrom Lots 5 & 6, Block 2, of the plat of Kabekonah to be hereafter recorded as such, and described by metes and bounds as follows, to-wit: Beginning at a numbered iron pin 485 feet North 53° East of the meander post between Sections 3 and 10; thence 4° East 100 feet; thence at right angles Eastward 100 feet; thence South 4° West 100 feet; thence at right angles Eastward 100 feet to the place of beginning, all being situated in the Southeast fractional Quarter, the South half thereof, Section 3, in Town 31 North, Range 9 East, as set forth in deed volume 79, page 450, Alpena County records."[1]

Apparently some time in 1959 the heirs partitioned the property each had owned an undivided interest in as joint tenants. Of the four lots resulting from the partition of the property, Archie Goodburne was given one lot and Elizabeth Wilson and David Goodburne received an adjacent lot north of Archie's. Taxes were paid by the respective owners on both lots from 1960 through 1969. The description for tax purposes of the David Goodburne-Elizabeth Wilson parcel (hereinafter known as the Goodburne-Wilson parcel) was:

[1] The exception in the description of the Alberta Goodburne property noted in the text reads in part: "4° east 100 ft." This was an obvious typographical error in the probate court record, and should read: "north 4° east 100 ft."

"Com 330.1 ft N of S 1/4 post, th S 86° 16′ E 2232.35 ft, th N 13° 56′ E 225.38 ft, th N 17° 20′ W 106.31 ft, th N 86° 02′ W 2229.63 ft th s 4° 16′ W 330.1 ft to POB *exc com 485 ft N 53° E from meander post on S sec line, th N 4° E 100 ft, th N 86 W 100 ft, th S 4° W 100 ft., th S 86° E 100 ft to POB. Part of S 1/2 of SE 1/4.*" (Emphasis supplied.)

The property description in the State of Michigan deed to the defendants Muller matches the exception in the Goodburne-Wilson parcel quoted above.

Meanwhile, in 1953 Robert Fisher, now married, took title to the land in question with his wife by the entireties through the agency of a strawman. It is through the resulting deed that plaintiffs claim the property in question. The land was described as follows:

"Lots 5 and 6, Block 2, of the Plat of Kabekonah (to be hereafter recorded as such) and described by metes and bounds as follows, to-wit: Beginning at a numbered Iron Pin,—485—feet North 53° East of the Meander Post between Sections 3 and 10, thence North 4° East 100 feet, thence Westward at right angles 100 feet, thence South 4° West 100 feet, thence at right angles Eastward 100 feet to the Place of Beginning, all being situated in the Southeast fractional Quarter, the South half thereof, Section 3, Township 31 North, Range 9 East, Michigan."

Plaintiffs recorded their deed, containing their residential mailing address, with the register of deeds in 1953.

In 1962 the plaintiffs' land was for the first time placed on the tax assessment rolls. Apparently the assessed value was $200 and the tax for 1962 was $6.94. The owner's name was listed as unknown on the tax rolls. The 1962 taxes were not paid on the property and the property eventually reverted to the state on June 1, 1966, because of the resulting

tax delinquency. The parcel was later sold by public auction to the defendants Muller for $705. A deed was issued to the Mullers on the property by the State of Michigan on August 15, 1969.

· In voiding the tax deed the trial court held that plaintiffs' property was included in the property descriptions of Archie Goodburne and David Goodburne and Elizabeth Wilson for tax purposes. The trial court found that taxes had been paid on the two above parcels in 1962, the year the plaintiffs were allegedly delinquent in paying their taxes, so no taxes were in fact owed on plaintiffs' land and therefore the tax sale to defendants Muller was void. The trial court cited *Rayner v Lee,* 20 Mich 384 (1870), and *Reed v Welsch,* 358 Mich 579; 100 NW2d 473 (1960), for the proposition that a tax sale deed is void in the event that the property was twice assessed and once paid. Moreover, the trial court held that plaintiffs did not have actual or constructive notice of their tax liability because no notice of either tax assessment or the later tax sale was ever given them and because they relied on the county treasurer's statements that they would be notified of any tax assessment. Therefore, the trial court felt that a ruling that plaintiffs had been delinquent in paying their property taxes was improper. The Mullers' basic objections on appeal go to the factual and legal validity of these findings by the trial court.

## I

First, as to the trial court's ruling that plaintiffs' property was twice assessed and once paid, after examination of the entire record we conclude we would have arrived at a different result than the trial court did were we sitting as the trial chancellor. *Ogorek v Loisell,* 33 Mich App 245; 189 NW2d

738 (1971). The above quoted property descriptions clearly show that when Alberta Goodburne's estate was settled in 1949, the description of the land transferred to her heirs specifically excepted the plaintiffs' property. As aforesaid, when the land was subsequently partitioned into four lots among the heirs, Archie Goodburne received one and David Goodburne and Mrs. Elizabeth Wilson received another. These lots were adjacent, but the Goodburne-Wilson deed description specifically excepted the Fisher property.[2] Thus, even though taxes were fully paid on the Goodburne-Wilson parcel in 1962, since the Goodburne-Wilson property excepted the plaintiffs' property, taxes on plaintiffs' property could not have been paid by payment of the Goodburne-Wilson property taxes. The trial court ruled that evidence introduced at trial conclusively proved that the lot belonging to plaintiffs was included in *both* the property descriptions given to the lots of Archie Goodburne and that of David Goodburne and Elizabeth Wilson. Contrary to the trial court's finding, the evidence introduced below does not conclusively prove that the premises belonging to the plaintiffs were included in both the descriptions assigned to the property of Archie Goodburne and to the property of David Goodburne and Elizabeth Wilson. The survey performed by James L. Scott and heavily relied on by plaintiffs and the trial court in its opinion illustrated that a small portion of the plaintiffs' land is included in the Archie Goodburne property. Scott testified that based on his survey the encroachment of plaintiffs' land on

---

[2] The exception quoted from the tax description of the Goodburne-Wilson property in the text above does not jibe with the description of the Fisher property, also quoted above. There is a 4° difference in directions of the description, which difference went unnoted either in the trial or in the briefs on appeal. Although the difference in the descriptions is unexplained, it does not affect our basic analysis.

Archie Goodburne's property was 18.3 feet on one end and 40 feet on the other end, which left portions of plaintiffs' 100-foot by 100-foot lot within both the Goodburne-Wilson parcel and the Archie Goodburne parcel. However, Scott testified that his survey of plaintiffs' land was not based on plaintiffs' deed, but on the line of occupation pointed out to him by Mr. Fisher. Moreover, Scott testified that the survey did not agree with the deed description of plaintiffs' land.

Furthermore, Mr. Fisher himself admitted that the Goodburne-Wilson property description specifically excepted his property.

*"Q. [Mr. Snyder, assistant attorney general]:* Well, you heard Mr. Scott testify that he endeavored to make four fairly equal parcels of land?

*"A. [Mr. Fisher]:* Yes, yes.

*"Q.* To divide it up. And on one description of Mrs. Wilson, the property that she has does not include yours, is that correct?

*"A. It does include it. In fact, the bulk of that property is on Mrs. Wilson; in that area.* Isn't that right?

*"Mr. Gillard [Plaintiffs' attorney]:* Just answer Mr. Snyder what you know from Mr. Scott's survey and where the line has been put.

*"Q. [By Mr. Snyder, continuing]:* Are you familiar with legal descriptions, sir?

*"A.* Well, what do you have reference to?

*"Q. I'll call your attention to paragraph 6 of your Complaint which describes Mrs. Wilson and David Goodburne's Property description.*

*"A.* Yes.

*"Q. And I will direct your attention further to some wording that says excepting, commencing 485 feet north—and so forth.*

*"A. Yes, well, that is the piece of property that you have reference to now?*

"*Q. That is the one that you have the interest in, is that right?*

"*A. Yes, that is right.*

"*Q. So that whatever she owns along that tract of land, that excludes or excepts yours?*

"*A. That's right, yes.*

"*Q.* And you never paid taxes on these properties?

"*A.* Well, I'll tell you the way it started. Originally, when I first purchased the property, I went to the tax office here in Alpena and asked about the taxes. He told me at the time that—I stated that he paid eighteen to sixteen dollars a year, but I understand now from the record he only paid five dollars a year. And I assumed that he had forty acres, but I see that he had sixty some acres. On that he paid five dollars a year taxes. On this little piece, a hundred by a hundred, the taxes would be so little or infinitesimal that it wouldn't even pay to issue one and they told me they would put it on the Goodburne tax roll and when it was taken off the Goodburne tax roll I would be notified. Consequently, I never checked in on this due to the fact that I was told that." (Emphasis supplied.)

We must conclude on the basis of this evidence that plaintiffs' property could not have been included for tax purposes in either or both of the descriptions of the Archie Goodburne and Goodburne-Wilson properties. Therefore, plaintiffs' property taxes were not twice assessed and once paid.

II

As to the validity of the trial court's holding that plaintiffs did not have actual or constructive notice of the 1962 tax assessment and therefore were not accountable for any resulting delin-

quency, we have more difficulty.[3] A review of the real property taxation law in effect at the time the events in this case transpired may be a helpful precedent to our analysis of the record on this issue.

Annually the appropriate assessing officer for the relevant taxing unit is required to assess, according to its true cash value, all the taxable property within his taxing unit. MCLA 211.10; MSA 7.10; MCLA 211.18; MSA 7.18; MCLA 211.24; MSA 7.24. MCLA 211.18; MSA 7.18[4] before amendment by 1964 PA 275 ordered the supervisor or assessing officer to:

"require every person of full age and sound mind who the supervisor or assessor believes has property which is not exempt from taxation, to make and subscribe to a true and correct written statement, under oath, administered by such supervisor or assessing officer, or other officer qualified to administer oaths under the laws of this state, of all the taxable property of such person, firm or corporation, whether owned by him or it or held for the use of another."

Thereafter MCLA 211.24; MSA 7.24 requires that:

"On or before the first Monday in March in each year, the supervisor or assessor shall make and complete an assessment roll, upon which he shall set down the name and address of every person liable to be taxed in his township or assessment district, with a full description of all the real property therein liable to be taxed. *If the name of the owner or occupant of any such tract or parcel of real property is known, he shall enter the name and address of such owner or occupant as in this act provided, opposite to the description thereof; in*

[3] No objection was made below or here on appeal by either the plaintiffs or the defendants that the statutory notice requirements and time limits for redemption were not followed, so we need not discuss this issue. See MCLA 211.140 *et seq.;* MSA 7.198 *et seq.*

[4] 1964 PA 275 made the statute permissive.

*all other cases the real property described upon such roll shall be assessed as 'owner unknown'."* (Emphasis supplied.)

See, also, MCLA 211.3; MSA 7.3; MCLA 211.5; MSA 7.5. After the assessing officer completes the tax assessment roll, it must be submitted to a board of review, which:

"[S]hall proceed to examine and review the same, and during that day, and the day following, if necessary, *said board, of its own motion, or on sufficient cause being shown by any person, shall add to said roll the names of persons, the value of personal property, and the description and value of real property liable to assessment in said township, omitted from such assessment roll;* they shall correct all errors in the names of persons, in the descriptions of property upon such roll, and in the assessment and valuation of property thereon, and they shall cause to be done whatever else may be necessary to make said roll comply with the provisions of this act. * * * The board shall pass upon each valuation and each interest, and shall enter the valuation of each, as fixed by it, in a separate column. The roll as prepared by the supervisor shall stand as approved and adopted as the act of the board of review, except as changed by a vote as herein provided. If for any cause a quorum does not assemble during the days above mentioned, the roll as prepared by the supervisor shall stand as if approved by the board of review. *Notice of the date, time and place of the meeting of the board of review shall be given at least 1 week prior to such meeting by publication in a generally circulated newspaper serving the area. Such notice shall appear in 3 successive issues of the newspaper where available; otherwise, by the posting of such notice in 5 conspicuous places in the township."* MCLA 211,29; MSA 7.29 (Emphasis supplied.)

A personal notice to the taxpayer when the board of review made a change in the assessment of property or added property to the assessment roll

was *not* required until 1964 PA 275, two years after the assessment change in issue in this case was made. See, also, OAG, 1947–1948, No 197, p 234 (March 18, 1947); *Hinds v Belvidere Twp,* 107 Mich 664; 65 NW 544 (1895). After its required meetings at which a taxpayer may object to his assessment, the board of review certifies the assessment roll. MCLA 211.30; MSA 7.30. Failure of the taxpayer to raise objections prior to certification will normally end the taxpayer's right to further administrative or judicial review of the assessment. See *Hinds, supra;* 2 OAG, 1958, No 3,009, p 75 (March 7, 1958); *Consumers Power Co v Muskegon County,* 346 Mich 243; 78 NW2d 223 (1956); *Michigan Savings Bank v Detroit,* 107 Mich 246; 65 NW 101 (1895). After certification the supervisor gives the tax assessment roll and a warrant to the township treasurer, who is required to collect the taxes. MCLA 211.42; MSA 7.83. The treasurer or tax collector must then:

*"[M]ail to each taxpayer at his last known address on his tax roll,* on the receipt of such tax roll, a statement showing the description of the property against which the tax is levied, the assessed valuation of such property and the amount of the tax thereon. * * * *Failure to send or receive such notice shall not in any way prejudice the right to collect or enforce the payment of any tax."* MCLA 211.44; MSA 7.87. (Emphasis supplied.)

When the taxes become delinquent, the collector shall:

"[C]all personally upon each person liable to pay such taxes, if a resident of such township, or at his usual place of residence or business therein, and demand payment of the taxes charged against him. If such person is not a resident of the township, but resides within the county, or an adjoining county, *and his residence is known to the treasurer, he shall make such*

*demand either personally or by mail."* MCLA 211.46;
MSA 7.90. (Emphasis supplied.)

If the taxes remain unpaid, a tax sale on behalf of
the state may become necessary. MCLA 211.60;
MSA 7.104. Notice of the tax sale must be sent to
each person who is assessed to his last known post
office address, but:

"Provided, That failure to receive or serve such notice
shall not invalidate the proceedings taken under the
auditor general's petition and decree of the circuit
court, in foreclosure and sale of the lands for taxes."
MCLA 211.61a; MSA 7.106.

Because of the above proviso, service of notice for
tax sales has been held not to be a procedural
requirement. *Lake Orion Heights, Inc v Oakland
Circuit Judges,* 285 Mich 512; 281 NW 307 (1938).
Notice by publication may also be made. MCLA
211.62 *et seq.;* MSA 7.107 *et seq.* The question of
the minimum notice necessary for due process
prior to tax sales is now before the Michigan
Supreme Court. See *Dow v Michigan,* 46 Mich App
101; 207 NW2d 441 (1973), *lv granted* 389 Mich
817 (1973). After sale, redemption by the taxpayer
remains a possibility. MCLA 211.140 *et seq.;* MSA
7.198 *et seq.*

Under the statutes, as outlined above, in effect
in 1962 when plaintiffs were first assessed property
taxes, the taxpayer was obviously presumed to
know the powers and duties of the board of review
and to know the dates the board met via publica-
tion of the appropriate notice in a local newspaper.
Thus, the taxpayer had no actual notice of his
property tax increases until he received his tax
statement, after which time the board of review
had met and the time for administrative appeals
(and therefore the required exhaustion of the tax-

payer's administrative remedy needed prior to pursuit of any judicial remedy) had passed. *Auditor General v Smith,* 351 Mich 162; 88 NW2d 429 (1958). Of course, timely objection before the board of review was not required if the board did not have jurisdiction in the first place. See *Greilick v Traverse City,* 231 Mich 699; 204 NW 718 (1925), and cases cited therein.

We deem that when a taxpayer's address was known the notice by publication that was required of any tax assessment changes made by the board of review under the law operating in 1962 was constitutionally insufficient. Publication is not an adequate substitute notice for personal notice by mail where possible under due process principles. *Mullane v Central Hanover Bank & Trust Co,* 339 US 306; 70 S Ct 652; 94 L Ed 865 (1950). See an extensive outline of the present-day standards for constitutionally adequate notice in Judge GILLIS' dissent in *Dow, supra.*

Be that as it may, the plaintiffs' address in this case was claimed *not* to be known by any of the tax assessing authorities involved in the 1962 assessment, or to any of those public officials involved in the tax sale. Thus, arguably no due process questions are before us now. However, the trial court in its opinion, at least intimated that the lack of *actual* notice violated plaintiffs' right to due process. This supposition was based on Mr. Fisher's reliance on the alleged statement by the county treasurer in 1933 that he would be notified of any tax assessment changes and on the allegation by the trial court that "the records of the Alpena County register of deeds office as well as the Alpena County treasurer's set forth the correct address of plaintiffs". Contrary to the trial court, we find no evidence or testimony introduced in the

trial that the Alpena County treasurer's records set forth the correct address of the plaintiffs. We do agree, however, with the trial court's statement that the register of deeds records show plaintiffs' correct mailing address. That fact is inescapable. In 1953 plaintiff Robert Fisher had taken title to the land in question with his wife by the entireties through the agency of a strawman. The resulting deed, with plaintiffs' mailing address, was filed in the register of deeds office.[5] Under MCLA 211.41a; MSA 7.82(1) the county board of supervisors *may require* that the register of deeds:

> "[W]ithin 30 days of the recording of any instrument conveying an interest in land, shall furnish the supervisor or supervisors of the township or townships in which the parcel or parcels of land are situated, a statement giving the names of the parties to the instrument recorded, a description of the parcel or parcels of land covered by the instrument recorded, and the interest in land conveyed."

This requirement did exist in Alpena County, as is evident from the testimony of Mr. Coombs, Alpena County Treasurer for almost nearly 30 years at the time of trial:

> "*Q. [Mr. Snyder]:* When did you first become aware of the existence of any omission of this property from the assessment roll?
> "*A.* Well, the township assessor put it on. I didn't have anything to do with that.
> "*Q.* Okay. And when was that?

---

[5] We note in passing that MCLA 211.135; MSA 7.194 mandated that the register of deeds before accepting the deed for filing require the plaintiffs to present a certificate from the auditor general or county treasurer of the county where the land was located that all taxes due on the land had been paid for the five years next preceding the date of the deed. In default of the presentation of such a certificate, the register of deeds would have been prohibited from recording the deed under the threat of misdemeanor penalties.

*"A.* Well, the first roll it was on there—about—

*"Q. [Interposing]:* 1962?

*"A.* No, it was before that. 1959 or '60. Somewhere in there.

*"The Court:* As I understand it, the 1962 tax rolls is the first time the description appears on the tax roll, listed as unknown.

*"A.* Yes, that's right. * * *

*"Q. [Mr. Muller]: Mr. Coombs, do you get from the register of deeds a record of transfers?*

*"A.* No.

*"Q. That goes to the assessor?*

*"A. Yes."* (Emphasis supplied.)

It can easily be seen from this testimony that indeed the township assessor had notice of plaintiffs' mailing address and the assessor was required to give such information to the township treasurer. Plaintiffs' mailing address, therefore, was not in fact unknown to the taxing officials.

However, this conclusion only pushes us back into more statutory analysis. As will be recalled from the quoted portion of MCLA 211.44; MSA 7.87 above, the failure to mail or receive notice of an assessment change under the property tax laws does not by law prejudice the right to collect or enforce the payment of any tax. Thus, the argument goes, even if it is concluded that the local assessor had sufficient notice to personally notify by mail the plaintiffs of their 1962 tax assessment increase, the failure to do so did not prohibit the tax collection and tax sale. We cannot countenance this argument. In the first place, such a contention, if true, would offend due process principles. Again, see Judge Gillis' dissent in *Dow, supra,* for the appropriate constitutional standards that apply here as well as in tax sales. See, also, *Thompson v Auditor General,* 261 Mich 624; 247

NW 360 (1933). Secondly and more basically, we do not agree that the argument reflects the correct interpretation of MCLA 211.44; MSA 7.87. The statement in this statute that "failure to send or receive such notice shall not in any way prejudice the right to collect or enforce the payment of any tax" does not in our view mean that the notice of assessment changes is not required. It merely means that should the assessing authorities fail for a period of time to give or attempt to give reasonable notice of the assessment change, that fact will not prejudice the assessing authorities' right to, in some later taxing period, give or attempt to give the proper notice and collect previously owed taxes. This explanation of the statute is consistent both with due process principles and with the rule that tax statutes are to be strictly construed. See *Thompson, supra.* It is also compatible with the precept that every owner of land is chargeable with notice that a tax will be levied on the land each year. *Blunt v Auditor General,* 324 Mich 675; 37 NW2d 671 (1949). This latter rule does not mean that a landowner must annually report to the local tax assessing authorities to discover his assessment, but rather that after reasonable notice is made or at least attempted to be made and the taxpayer still neglects or refuses to pay his property taxes, the risk of incurring a state lien on his land and possible tax sale thereof is his to bear. Because the taxpayer is presumed to know his land is taxable, the notice need not be made by personal service, but may be made by mail.

Thus, we find in the facts and circumstances of this case that the failure to give plaintiffs proper notice by mail of their 1962 tax assessment increase when their residential mailing address was known barred the subsequent tax lien and sale of

plaintiffs' land.[6] We do not have a situation like that before the Court in *Chilton's, Inc v Wilmington Apartment Co,* 365 Mich 242; 112 NW2d 434(1961), where a tax sale was held proper despite a lack of notice of the assessment or sale to the landowner because he, rightly charged with notice that real property is subject to taxation, failed to record his deed. See, also, *Brinker v Auditor General,* 339 Mich 84; 62 NW2d 635 (1954).

## III

As aforementioned, the trial court in its opinion intimated that a sort of equitable estoppel militated against any decision rejecting plaintiffs' claim. The trial court obviously felt that Mr. Fisher was truthful in recounting his visit with the county treasurer in 1933, and could therefore have justifiably relied on statements made to him by the treasurer. Because of the above noted presumption that a landowner is deemed to expect that his land will be taxed, it is questionable whether plaintiffs could have justifiably relied on 30-year-old statements made by the county treasurer that taxes were not owing. In the older cases at least, the courts have not favored estoppel arguments under such circumstances. See *Brinker, supra; Lovett v Detroit,* 286 Mich 159; 281 NW 576 (1938); *Consumers Power Co, supra.* However, the

---

[6] We are cognizant of the statement in MCLA 211.70; MSA 7.115 that "no sale shall be set aside after confirmation, except in cases where the taxes were paid, or the property was exempt from taxation." However, regardless the effect of this statute, if the sale is void for want of jurisdiction to make it, the sale can be attacked despite the statute. *McQuade v State Land Office Board,* 321 Mich 235; 32 NW2d 510 (1948). See also *Greilick,* cited in the text, *supra.* Jurisdiction obviously cannot attach where minimum constitutional standards of due process through appropriate notice are not met. *Covey v Town of Somers,* 351 US 141; 76 S Ct 724; 100 L Ed 1021 (1956).

Supreme Court in *Spoon-Shacket Co, Inc v Oakland County,* 356 Mich 151; 97 NW2d 25 (1959), overruled *Consumers Power, supra,* to hold that equity will grant relief to a taxpayer who overpays his taxes where the mistake is of such a nature as to amount to constructive fraud. As we pointed out earlier in footnote 5, Mr. Fisher not only questioned the county treasurer's office in 1933 as to his tax liability, but also must of necessity have received a certification that no taxes were owing for five years prior to 1953, the year he filed his deed with the register of deeds. Moreover, there is nothing in the record which indicates that despite the deed recordation in 1953 plaintiffs were ever required by the supervisor or assessing officer pursuant to MCLA 211.18; MSA 7.18 quoted above to make a statement listing their real property holdings. The county treasurer during trial testified that the township supervisor received a record of transfers from the register of deeds, so it would have been a simple matter for the supervisor or assessing officer to notify plaintiffs by mail that a property statement was required of them. We are forced to conclude that when these factors are added together they present an appropriate case for the operation of equitable estoppel to free plaintiffs of the tax delinquency charged against their land.

## IV

In conclusion we observe that the trial court assessed costs against the defendants Muller for this action. Public officials appear primarily responsible for plaintiffs' troubles, not the Mullers, and therefore in the interest of equity we hereby order that the court costs of trial and of appeal not be assessed against defendants Muller. Since we

hold that the tax assessment without notice and the resulting property sale were improper, the state's deed to the Mullers is void. The state shall return to the Mullers the purchase price of the land plus any taxes paid by them thereon.

The judgment of the trial court is affirmed as amended.

All concurred.